IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jerry Christopherson, )<br>)<br>            Plaintiff, )<br>)<br>   vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>)<br>            Defendant. )<br>) | Civil Action No. 6:15-4725-JMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on March 29, 2012, and March 31, 2012, respectively, alleging that he became unable to work on December 15, 2011. The applications were denied initially and on reconsideration by the Social Security Administration. On September 21, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and Pedro M.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Roman, an impartial vocational expert, appeared at a video hearing on January 16, 2014, considered the case *de novo*, and on June 13, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 25, 2015 (Tr. 1-3). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> (2)  The claimant has not engaged in substantial gainful activity since December 15, 2011, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq*. and 416.971 *et seq.*).
>
> (3)  The claimant has the following severe impairment: Degenerative Disc Disease with Status Post L4-5 Decompression (20 C.F.R. §§ 404.1520(c) and 416.920 (c)).
>
> (4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to stand or walk for approximately 4-6 hours in an 8-hour workday with normal breaks; sit for approximately 6 hours in an 8-hour workday with normal breaks; frequently use his upper extremities bilaterally; the claimant can occasionally operate foot controls bilaterally; cannot climb ladders, ropes, or scaffolds; can occasionally balance, and may require the use of a hand-held assistive device (e.g. a cane) when balancing (and walking) on uneven terrain or prolonged ambulation (i.e., walking of more than one hour at time), and if using a cane, can use the contra-lateral upper extremity to lift and carry up to the exertional limits described above, can occasionally stoop, kneel, crawl, or climb ramps and stairs; cannot crouch; and should avoid even moderate exposure to hazards (moving machinery, unprotected heights). Additionally, the claimant is

limited to work involving simple, routine, and repetitive tasks (this is due to the side effects of medications, and in giving the claimant the benefit of the doubt as to complaints of pain; it is not due to any established or alleged mental impairments).

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on August 31, 1965, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

On December 5, 2011, the plaintiff was treated at Doctors' Care Berea for left hip pain and swelling. The plaintiff reported burning pain down his left side and burning pain into his left leg. He reported being unable to work due to his pain. The doctor ordered x-rays, referred the plaintiff for an orthopedic evaluation, and prescribed Flexeril and Ultram (Tr. 317-18).

On December 14, 2011, Frank Armocida, M.D., evaluated the plaintiff for back and left leg pain. Dr. Armocida noted that the plaintiff had problems on and off for over eight years. The plaintiff described his pain as left-sided low back pain that tended to be constant with some numbness occasionally going down into his leg. The plaintiff rated his pain at six out of ten and reported that his left leg felt a little bit weaker. Dr. Armocida reviewed the plaintiff's hip and back x-rays, which showed some ossification along the super-olateral aspect of the labrum on the left side and disc space narrowing at L4-5 with some spurring at that level. Dr. Armocida indicated that the plaintiff had difficulty with toe-walks and heel-walks. The plaintiff's strength testing showed some weakness in his EHL on dorsiflexion on the left side. Dr. Armocida diagnosed L4-5 lumbar disc degeneration and probable lumbar radiculopathy, left-sided. He ordered an MRI (Tr. 332-33).

On December 20, 2011, the MRI study of the plaintiff's lumbar spine showed a left L4-L5 neuroforaminal disc bulge producing moderate left neuroforaminal stenosis that could produce a left L4 radiculopathy (Tr. 285-86, 331).

The following month, the plaintiff began treatment with Sanjiptal Gill, M.D., of Village Orthopedic Surgery (Tr. 280-86, 321-353). On January 9, 2012, the plaintiff told Dr. Gill that Mobic helped him "a lot," Flexeril helped him sleep, and Ultram was ineffective (Tr. 282). On examination, the plaintiff had significant weakness of the left leg with 4/5 tibialis anterior and EHL strength. The plaintiff's right and left quadriceps were also 4/5. The plaintiff exhibited 2+ reflexes throughout, down-going Babinski, and no clonus (Tr. 282). Dr. Gill indicated that the plaintiff's MRI showed relatively patent L1-2, L2-3, L3-4, and L5-S1 areas as well as left foraminal stenosis at L4-5. Dr. Gill's diagnoses were L4-5 disc protrusion and left-sided radiculopathy. Dr. Gill recommended an L4-5 transforaminal injection on the left side and physical therapy for core strengthening. He noted that the plaintiff would most likely be a candidate for L4-5 decompression and possible discectomy

(Tr. 282-84). On January 25, 2012, the plaintiff underwent a left-sided transforaminal epidural steroid injection at the L4 level (Tr. 329-30).

When he returned to Dr. Gill on February 6, 2012, the plaintiff reported some improvement with the injection. He exhibited slightly greater (4+/5) strength in his left leg and was using a cane to ambulate. Dr. Gill recommended surgery, which the plaintiff declined (Tr. 281).

On February 27, 2012, the plaintiff began pain management treatment with Husam Mourtada, M.D. (Tr. 288). During four routine visits through June 2012, Dr. Mourtada reported that the plaintiff had an unsteady gait, used a cane for stability, and exhibited very limited lumbar spine range of motion, 4/5 motor strength in his left leg, 5/5 motor strength in his right leg, no focal sensory deficits in his left leg, 1+/4 (normal) deep tendon reflexes, and negative straight leg raising bilaterally (Tr. 289, 292, 295). The plaintiff had severe focal tenderness over the left lower lumbar spine and increased pain with movement. Dr. Mourtada indicated that the plaintiff had reduced left lower extremity strength and indicated that the plaintiff had very tight hamstrings. The plaintiff reported having pain since 2005, which had gotten worse, but no trauma. He reported that his pain was across his low back on the left occasionally radiated into his left lower extremity. The plaintiff also reported weakness and occasional numbness in tingling and muscle spasms. He indicated that his pain was worse with walking, sitting, standing, bending, lifting, and rain, and better with resting and hot showers. Dr. Mourtada noted that the plaintiff had tried physical therapy and an injection without benefit. Dr. Mourtada reviewed the plaintiff's MRI results and the surgery recommendation. Dr. Mourtada diagnosed lumbar back pain with left L4 radicular symptoms and L4-5 disc protrusion and left side stenosis. Dr. Mourtada explained that his goal was to reduce pain and improve function. The plaintiff rated his pain at five out of ten. Dr. Mourtada prescribed and adjusted the plaintiff's medication regimen, which included Neurontin and Ultram (Tr. 293, 296, 298). The plaintiff reported that

medication reduced his pain and improved his function (Tr. 294, 297). Dr. Mourtada ordered a baseline urine drug screen and gave the plaintiff a copy of a pain contract (Tr. 288-90).

At the state agency's request, Gordon Early, M.D., examined the plaintiff on June 14, 2012 (Tr. 300-02). The plaintiff reported a ten-year history of back pain for which he was taking Ultram and Gabapentin (Neurontin) (Tr. 300). He presented with a cane, which he reported using for about six months. The plaintiff stated that he completed the tenth grade and could read well. On examination, the plaintiff appeared muscular with full range of motion in his arms and legs. He could flex his knees to 130 degrees and forward flex his back to touch his ankles. He performed a heel gait, but had trouble with tandem and tiptoe gait. He reported having left sciatica as well. Dr. Early reviewed the plaintiff's work and past medical histories. Dr. Early found the plaintiff to be "moderately depressed." Dr. Early found the plaintiff to have full range of motion in his upper extremities, but his right shoulder showed some pain on full abduction in supraspinatus testing. There was a large scar over the plaintiff's right forearm and atrophy in the flexor muscles in this area. Dr. Early explained that this was where the plaintiff had a near-amputation when he was nine years old. Dr. Early noted some weakness in a couple of the plaintiff's lumbrical muscles in his right hand and a little atrophy in digit 5. The plaintiff's lower extremities and back had full range of motion. Dr. Early found Waddell's positive x 1. The plaintiff's hip rotation induced lumbar pain, and his gait showed a light left heel plant. Dr. Early indicated that the plaintiff forward flexed 10 degrees when walking and noted that he stumbled when he started walking without his cane. He was "a lot more stable" when he used the cane. Dr. Early found the plaintiff to have a great deal of difficulty doing tandem gait and indicated that the plaintiff showed moderate ataxia. Dr. Early indicated that it would be helpful to get the plaintiff's past medical records (Tr. 300-302). From a neurological standpoint, he exhibited intact short-term and long-term memory (Tr. 301). He assessed "low back pain

with ataxia and recent use of cane due to ataxia," noting that the plaintiff's cane use was not due to weakness (Tr. 302).

Two state agency psychologists, Anna Williams, Ph.D., and Debra Price, Ph.D., independently reviewed the record in July 2012 and September 2012, respectively (Tr. 71-72, 94-95). Both mental health consultants concluded that the plaintiff's alleged depression was nonsevere and caused no mental work-related restrictions (Tr. 71-72, 94-95).

On July 18, 2012, state agency physician Dale Van Slooten, M.D., opined that the plaintiff could lift, carry, push, and pull 20 pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours during an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; and could not tolerate even moderate exposure to hazards such as machinery and heights (Tr. 73-75).

On August 31, 2012, Dr. Mourtada evaluated the plaintiff for followup of pain. The plaintiff reported that his medications were not helping like they had before. Dr. Mourtada found the plaintiff to have very limited range of motion of the lumbar spine, severe focal tenderness over the left lower lumbar spine, and increased pain with movement. Dr. Mourtada indicated that the plaintiff had reduced left lower extremity strength and very tight hamstrings. He noted that the plaintiff used a cane for stability and had an unsteady gait. Dr. Mourtada increased the plaintiff's dose of Ultram (Tr. 358-60).

On September 13, 2012, state agency physician Seham El-Ibiary, M.D., reviewed the updated record and opined that the plaintiff could lift, carry, push, and pull ten pounds or less, and he could stand and/or walk for two hours during an eight-hour day (Tr. 108). Otherwise, Dr. El-Ibiary identified the same sitting, postural, and environmental restrictions found by Dr. Van Slooten (Tr. 96-98, 107-10).

On September 19, 2012, the plaintiff returned to orthopedic surgeon Dr. Gill complaining of severe weakness and pain in his left leg (Tr. 326-28). He indicated that his pain was ten+ out of ten. The plaintiff complained that he was having urinary problems that were very concerning. Dr. Gill again opined that the plaintiff was a likely surgical candidate (Tr. 326-28). On September 21, 2012, a lumbar spine MRI ordered by Dr. Gill revealed focal degenerative disc disease at L4-L5 resulting in moderate left foraminal narrowing grossly unchanged from the prior study, and no significant central stenosis (Tr. 324-25).

On October 4, 2012, Dr. Gill evaluated the plaintiff for followup of back pain. The plaintiff reported that using a cane helped, but he continued to have significant left leg pain. Dr. Gill recommended that the plaintiff obtain a primary care physician and also that he see an urologist for some decreased ability to maintain flow of urine. Dr. Gill indicated that the plaintiff did have limited range of motion. He stated that the plaintiff had significant weakness in his left leg with 3-/5 quadriceps, tibialis anterior, EHL. The plaintiff's pain went all the way down his posterior calf to mostly the bottom of his foot, but also to the top of his foot and the side. Dr. Gill discussed and scheduled surgery. He explained that the plaintiff understood very clearly that he may not get any better from surgery and may stay the same or worsen (Tr. 321-23).

On October 11, 2012, William Travis Ellison, M.D., evaluated the plaintiff as a new patient. At routine visits from October 2012 through December 2013, Dr. Ellison diagnosed and treated the plaintiff for hypertension, hyperlipidemia, degenerative disc disease, exogenous obesity, and restless leg syndrome (Tr. 380). He routinely noted that the plaintiff's back condition was stable (Tr. 380, 389), and with respect to his back pain, the plaintiff told Dr. Ellison that he was "doing well" (Tr. 386). The plaintiff specifically denied joint pain, back pain, stiffness, muscle weakness, loss of strength, and muscle aches (Tr. 382, 400). Dr. Ellison observed unremarkable findings on examination over this period, including that the plaintiff had a normal gait; normal leg strength and function;

normal sensation to light touch; and normal mentation, memory, and affect (Tr. 383, 387, 390, 393, 395, 397, 401-02).

On October 12, 2012, the plaintiff told Dr. Gill that using a cane helped his left-sided back and left pain, but he displayed significant weakness in his left leg with radiating leg pain (Tr. 322). The plaintiff agreed to undergo a "minimally invasive" back surgery (Tr. 321-23, 352-53).

On October 29, 2012, the plaintiff saw Dr. Gill for pre-operative evaluation. The plaintiff reported low back pain and left leg pain. He reported that his pain "moves around" and was sometimes on the inside of his left thigh and at other times was in his left calf. Dr. Gill reiterated the chance that surgery may not provide benefit. Dr. Gill noted that the plaintiff had limited range of motion and significant weakness of the left leg with 3/5 tibialis anterior and EHL, quadriceps strength and hip flexor strength. Surgery was scheduled (Tr. 352-53).

On October 30, 2012, Dr. Gill performed the surgery, a L4-L5 decompression and foraminal decompression of left L4-L5 and left L5-S1 (Tr. 334-35).

Two weeks after the surgery, Dr. Gill described the plaintiff's condition as "notably improved" with better strength (Tr. 347). The plaintiff used a cane for guidance and continued to complain of residual numbness in his left leg and some back pain, but nonetheless exhibited full (5/5) strength and no paresthesias from L1 to S1 (Tr. 347). Dr. Gill observed that the plaintiff was walking without instability and that x-rays showed excellent lordosis (Tr. 347-48). Dr. Gill recommended a course of outpatient physical therapy (Tr. 341-45).

Physical therapy was scheduled for the plaintiff between November 16, 2012, and December 16, 2012, which he started (Tr. 341-46). On November 9, 2012, it was noted that the plaintiff had a limited tolerance to physical therapy due to increased pain in his low back and left leg (Tr. 349). On November 9, 2012, December 18, 2012, and

January 7, 2013, Dr. Gill's office refilled the plaintiff's hydrocodone - acetaminophen (Tr. 339-40, 350).

On January 14, 2013, the plaintiff complained to Dr. Gill of lower back pain radiating into his right leg (Tr. 336-37). He reported that he typically walked with a cane, but he did not use a cane during the visit (Tr. 336). Dr. Gill reported that "[The plaintiff] is doing great. He is off of his cane now and is walking much better. He has really no limp today" (Tr. 336). An examination of the plaintiff's left leg revealed full (5/5) strength and no paresthesias from L1-S1 (Tr. 337), but he exhibited some right leg radiculopathy and numbness (Tr. 338). Dr. Gill diagnosed lumbar spinal stenosis and opined that the plaintiff was doing well post-operatively (Tr. 338). He recommended that the plaintiff return as needed (Tr. 338). The plaintiff had no additional treatment with Dr. Gill for the remainder of the relevant period.

On February 8, 2013, Dr. Mourtada evaluated the plaintiff. He noted that the plaintiff's surgery had initially helped but that he had been starting to have pain, but less than before surgery. The plaintiff rated his pain at six out of ten (Tr. 354-57). On May 10, 2013, Dr. Mourtada evaluated the plaintiff and noted that his prior urine drug screen showed his prescribed medications and nothing else (Tr. 374-77). On August 2, 2013, Dr. Mourtada evaluated the plaintiff for pain management followup (Tr. 370-73). On October 18, 2013, Dr. Mourtada evaluated the plaintiff and noted that he was doing well on that day. The plaintiff indicated that his pain medications helped reduce his pain and improve his function (Tr. 366-69). At the four visits between February and October 2013, Dr. Mourtada noted that the plaintiff displayed an antalgic gait, limited lumbar spine range of motion, focal tenderness of the left lower spine, 5/5 motor strength in the right leg, 4/5 motor strength in his left leg, no focal sensory deficits, normal deep tendon reflexes in his ankles and knees, and negative straight leg raising bilaterally (Tr. 356, 368, 372, 376). Dr. Mourtada prescribed Tramadol and Neurontin (Tr. 356, 368, 372, 376).

On a questionnaire completed in July 2013, Dr. Mourtada opined that the plaintiff's back condition would prevent him from performing more than sedentary work; the plaintiff would require one-hour rest breaks away from his workstation; and the plaintiff would "maybe" have attention and concentration problems that would interrupt his ability to perform work-related tasks (Tr. 363-64). Dr. Mourtada based his opinion on the plaintiff's low back pain and history of lumbar decompression surgery. Dr. Mourtada indicated that the earliest date that the plaintiff was this disabled was 2012 (Tr. 363).

In February 2014, Dr. Mourtada noted his July 2013 questionnaire and explained that he based those limitations on the plaintiff's repeated clinical findings of very limited range of motion of the lumbar spine, focal tenderness over the left lower lumbar spine, and pain that increased with any movement. He indicated that the plaintiff's motor strength was 4/5 for the major muscle groups of both the lower extremities. Dr. Mourtada stated, "He had an antalgic gait, sufficiently severe that he needed a cane." Dr. Mourtada further stated that the plaintiff's back condition medically equaled the criteria of Listing 1.04(A). He noted that even though the plaintiff exhibited negative straight leg raising tests, "in light of the other findings[,] I can be confident that he has serious back problems independent of any nerve entrapment." Dr. Mourtada stated that he felt that the plaintiff's condition caused limitations equivalent to those in the listing (Tr. 407).

During the period he alleges disability, the plaintiff lived in a home with his family (Tr. 176). He cared for his personal needs independently, although he sometimes performed tasks slowly (Tr. 177). He prepared sandwiches, folded laundry, went outside daily, rode in a car, and shopped in stores with his wife (Tr. 178-79). He socialized with friends and family once or twice per week (Tr. 180). The plaintiff reported that he used a cane (Tr. 182).

The plaintiff was 46 years old on his alleged disability onset date and was 48 years old on the date of the ALJ's decision (Tr. 68). He completed the tenth grade in

regular classes (Tr. 35, 162-63). The plaintiff has past relevant work experience as a drywall applicator, installer, and foreman, which the vocational expert characterized as medium to very heavy in exertion and skilled in nature (Tr. 50-51, 163, 168). For most of his career, the plaintiff was self-employed as a drywall subcontractor (Tr. 38, 163, 168).

At the hearing, the ALJ asked the vocational expert to assume a person of the plaintiff's age, education, and vocational background, who was limited to jobs involving lifting and carrying up to 20 pounds occasionally and ten pounds frequently; standing or walking for approximately four to six hours in an eight-hour workday with normal breaks; sitting for approximately six hours in an eight-hour workday with normal breaks; frequent use of his upper extremities bilaterally; occasional operation of foot controls bilaterally; no climbing of ladders, ropes, or scaffolds; occasional balancing; use of a hand-held assistive device (e.g., a cane) when balancing and walking on uneven terrain or for prolonged ambulation (e.g., walking of more than one hour at a time) and, if using a cane, using the other upper extremity to lift and carry weight consistent with his stated lifting/carrying abilities; occasional stooping, kneeling, crawling, and climbing of ramps and stairs; no concentrated exposure to extreme cold and excessive vibration; not even moderate exposure to hazards (moving machinery and unprotected heights); and only simple, routine, and repetitive tasks to account for medication-related side effects and pain (Tr. 51-53).

The vocational expert testified that such a person could not perform the plaintiff's past relevant work as a drywall applicator, installer, and foreman (Tr. 53). He testified that the hypothetical individual could make a vocational adjustment to a significant number of light, unskilled jobs existing in the national economy, including the representative occupations of cashier II, finisher, and mail clerk (Tr. 53-56). The vocational expert also identified sedentary, unskilled jobs that a person with the plaintiff's vocational background and limitations could perform, including charge-account clerk, telephone quotation clerk, and finisher (Tr. 56-57). The vocational expert stated that his testimony was consistent with

14

the terms and descriptions contained in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 59).

The plaintiff's attorney asked, based on Dr. Mourtada's questionnaire, about "problems with attention and concentration sufficient to frequently interrupt tasks during the working portion of the workday" (Tr. 61):

> Let's assume the same age, education, work experience assumed in the judge's first hypothetical. And assume instead of any other limitations, that Mr. Christopherson would have to rest away from the workstation for significantly more than an hour during the working portion of the workday. No competitive employment?

(Tr. 61-62).  The vocational expert agreed that there would be no competitive employment with this limitation (Tr. 62).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) rejecting opinion evidence of treating specialist Dr. Mourtada, (2) failing to provide adequate reasons for his credibility determination, and (3) improperly relying on vocational expert testimony (doc. 15 at 2).

### *Vocational Expert*

The plaintiff argues that remand is warranted because the ALJ failed to obtain an explanation for the conflict between the plaintiff's residual functional capacity ("RFC") and the general educational development ("GED") reasoning level set forth in the *Dictionary of Occupational Titles* ("*DOT*") for the jobs identified by the vocational expert (doc. 14 at 33-36).  The undersigned agrees.

Social Security Ruling ("SSR") 00-4p provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the *DOT*.  In these situations, the adjudicator will:

> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

2000 WL 1898704, at *4.

In the RFC finding, the ALJ limited the plaintiff to "simple, routine, and repetitive tasks" and noted that "this is due to the side effects of medications, and in giving the claimant the benefit of the doubt as to complaints of pain; it is not due to any established or alleged mental impairments" (Tr. 17). The vocational expert testified that, with the limitations that the ALJ ultimately included in the RFC finding, the plaintiff could perform jobs that exist in significant numbers in the national economy, including the light, unskilled jobs of cashier II, finisher, and mail clerk (Tr. 51-56). The vocational expert testified that his testimony was consistent with the information contained in the *DOT* (Tr. 59). The ALJ relied on the vocational expert's testimony to find that the plaintiff was not disabled under the Act (Tr. 22-24).

The jobs of a cashier II (*DOT* number 211.462-010) and a mail clerk (*DOT* 209.687-026) have a GED reasoning level of three. A reasoning level of three indicates that the job requires the person to be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *See DOT* (4th Ed., Rev. 1991), available at 1991 WL 671840 (*DOT* # 211.462.010, cashier II) and 1991 WL

16

671813 (*DOT* # 209.687-026, mail clerk).  The job of a finisher (*DOT* 789.687-050) has a reasoning level of two.  A reasoning level of two indicates that the job requires the person to be able to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations." *See id.*, available at 1991 WL 681262 (*DOT* # 798.687-050, finisher).

The Commissioner notes that the Fourth Circuit Court of Appeals has not addressed in a precedential decision whether a GED reasoning level of three is incompatible with the ability to perform simple, routine, repetitive work (doc. 15 at 22).  Thus, the Commissioner urges the court to follow the reasoning of courts in the Western District of North Carolina that have found no apparent conflict (*see id.*).  The Commissioner further argues that because the vocational expert identified one job with a reasoning level of two (finisher), the ALJ satisfied his step five burden of production (*id.* at 22-23).

While the Commissioner is correct that the Fourth Circuit has not spoken on this issue in a published case, the court recently held in an unpublished case, "We note that there is an apparent conflict between an RFC that limits [the claimant] to one-to-two step instructions and GED Reasoning Code 2, which requires the ability to understand detailed instructions." *Henderson v. Colvin*, 643 F. App'x 273, 276-77 (4th Cir. 2016).  The court in *Henderson* found that, because there was an apparent conflict between the vocational expert's testimony and the *DOT*, the ALJ in that case erred in relying on the vocational expert's conclusory testimony and in failing to inquire further. *Id.* at 277-78 (citing *Pearson v. Colvin*, 810 F.3d 204, 209-10 (4th Cir. 2015) (holding that a "ALJ independently must identify conflicts between the expert's testimony and the [*DOT*]" and that a vocational expert's testimony that apparently conflicts with the *DOT* can only provide substantial evidence if the ALJ received an explanation from the expert explaining the conflict and

determined both that the explanation was reasonable and that it provided a basis for relying on the experts testimony rather than the *DOT*)).

Furthermore, in this District, the court has repeatedly remanded for further administrative proceedings where the ALJ failed to inquire of the vocational expert regarding whether a claimant limited to simple, routine, repetitive work was capable of performing certain jobs that the *DOT* classified as reasoning level two or three. *See Shivers v. Colvin,* C.A. No. 6:12-3381-SB, 2014 WL 1315183, at *19-20 (D.S.C. March 18, 2014); *Graham-Willis v. Colvin*, C.A. No. 1:12-2489-JMC, 2013 WL 6840465, at *6-8 (D.S.C. Dec. 27, 2013); *Martin v. Astrue*, C.A. No. 6:11–1572–TMC–KFM, 2012 WL 4479280, at *15–16 (D.S.C. July 27, 2012), adopted by 2012 WL 4482943 (D.S.C. Sept. 27, 2012); *Phillips v. Astrue*, C.A. No. 3:11–1085–MBS-JRM, 2013 WL 3945310, at *8-9 (D.S.C. Aug. 14, 2012), adopted by 2012 WL 3945313 (D.S.C. Sept. 7, 2012); *Reid v. Astrue*, C.A. No. 6:10–2118–MBS–KFM, 2012 WL 667164, at *12–13 (D.S.C. Feb.8, 2012), adopted by 2012 WL 663482 (D.S.C. Feb. 29, 2012); *Tadlock v. Astrue*, C.A. No. 8:06–3610–RBH, 2008 WL 628591, at *10 (D.S.C. March 4, 2008).

Here, there is an apparent conflict between what the plaintiff is capable of performing and what the jobs cited by the vocational expert require. While there may be a reasonable explanation for the apparent conflict, the ALJ never discussed with the vocational expert whether the plaintiff's inability to perform more than simple, routine, repetitive work was compatible with the cited positions. Accordingly, it would be speculation for the court to assume the vocational expert realized the conflict and necessarily considered it. Therefore, the undersigned recommends remand for resolution of the apparent conflict.

***Remaining Allegations of Error***

In light of the court's recommendation that this matter be remanded as discussed above, the plaintiff's remaining allegations of error will not be addressed in detail.

18

*See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). On remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Accordingly, as part of the overall reconsideration of this claim upon remand, the ALJ should also consider and address the following additional allegations of error raised by the plaintiff: (1) that the ALJ erred in his consideration of the opinions of Dr. Mourtada (doc. 14 at 22-30; doc. 16 at 1-8) and, specifically, that Dr. Ellison's treatment notes, upon which the ALJ relied in discounting Dr. Mourtada's opinions, are repetitive boilerplate; and (2) the ALJ failed to provide specific reasons for his credibility finding and failed to discuss any of the relevant factors (doc. 14 at 31-33; doc. 16 at 8-12) (citing SSR 96-7p, 1996 WL 374186, at *3; 20 C.F.R. §§ 404.1529(c), 416.929(c))).

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 18, 2016
Greenville, South Carolina